IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| Dana B. **FULK** | ) | Case No.: 1:13-cv-00234 |
| **THE ESTATE OF JOHN H. FULK III** | ) | |
| John H. **FULK** III | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | (Jury Trial Requested) |
| **NORFOLK SOUTHERN RAILWAY COMPANY** | ) | |
| and **NORFOLK SOUTHERN CORPORATION** | ) | |
| | ) | |
| Defendants. | ) | |

Comes now the above-styled Plaintiffs, who allege the following facts and assert the following causes of action against the Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation.

**Parties, Jurisdiction & Venue**

1. Plaintiff Dana Fulk is an adult resident of Advance, North Carolina. She is the widow of Plaintiff John H. Fulk III, who was also an adult resident of Advance, North Carolina at the time of his death on 1/13/11.

2. On 2/2/11, Mrs. Fulk was granted letters testamentary and was appointed the personal representative of the Estate of John H. Fulk III by Superior Court Division of the General Court of Justice of Davie County, North Carolina.

3. Defendant Norfolk Southern Railway Company is a corporation organized under the laws of the State of Virginia with a principal place of business in the State of Virginia. Its registered agent for service is the Corporation Service Company, which can be served at 327 Hillsborough Street in Raleigh, North Carolina 27603.

4. Defendant Norfolk Southern Corporation is a corporation organized under the laws of

the State of Virginia with a principal place of business in the State of Virginia. Its registered agent for service is Roger A. Petersen, who can be served at 3 Commercial Place in Norfolk, Virginia 23510.

5. Defendants Norfolk Southern Railway Company and Norfolk Southern Corporation are hereafter collectively referred to as "NS."

6. This Court has federal subject matter jurisdiction over of this action pursuant to 28 U.S.C. § 1331 because Count 1 is authorized to be filed in this Court by the Federal Employers' Liability Act, 45 U.S.C. § 56 ("FELA") and Count 2 is authorized to be filed in this Court by the Federal Rail Safety Act, 49 U.S.C. § 20109(d)(3). ("FRSA").

7. Venue is proper in this division and district pursuant to 28 U.S.C. § 1391(b)(2) and 45 U.S.C.A. § 56 because a substantial part of the events or omissions giving rise to the claim occurred in this division and district. Venue is also proper in this division and district pursuant to 28 U.S.C. § 1391(b)(1),(c)(2),(d) and 45 U.S.C. § 56 because NS resides and/or does business in this division and district.

## Facts

8. NS is a common carrier by railroad engaged in interstate commerce.

9. Mr. Fulk worked for NS as a railroad car inspector at Linwood Yard, North Carolina.

10. In this position, Mr. Fulk was responsible for many safety-related functions, including the inspection of rail cars for defects and/or noncompliance with Federal Railroad Administration ("FRA") regulations.

11. When an inspector such as Mr. Fulk finds a defective or noncompliant car during an inspection, he/she is supposed to place a "bad order" tag on the car. This tag lists the defects and/or noncompliant issues and notifies the carmen (*i.e.* mechanics) in the repair shop what

repairs need to be made to the car. Such tagged cars are placed in a "bad order" status and are not allowed to be put in use by NS until the repairs are completed.

12. Prior to working for NS, Mr. Fulk served as a sergeant in the US Air Force as an aircraft mechanic. After his military service, before working for NS, Mr. Fulk also worked for US Air as an FAA certified airframe and power plant mechanic.

13. During both of these careers, strict adherence to the letter of the law, especially in equipment maintenance and repair, was the norm for Mr. Fulk and his co-employees.

14. After he started working for NS, Mr. Fulk became extremely bothered by the attitude of NS management toward FRA regulations. When there was a choice between getting a train out on time or following the regulations, NS management's decision to get the train out prevailed.

15. For example, NS management had "bad order" quotas and did not want inspectors or carmen, including Mr. Fulk, to place bad order tags on defective cars and cause the "bad order count" to go "up."

16. There were regular incidents of NS supervisors removing Mr. Fulk's bad order tags from cars without repairs being made. NS supervisors set a bad order target at fifty bad orders at any one time at Linwood Yard no matter how many were really defective and/or noncompliant. This fifty car "shop count" was discussed daily in the workplace. When the shop count got above fifty, NS management told the inspectors "we don't need any more bad order cars," which meant "stop bad ordering cars even if they are defective and/or noncompliant."

17. On information and belief, no Linwood car inspector had ever received discipline for failing to report a bad order or find a defect. However, if an employee started finding bad orders after there were already fifty, that employee was targeted and harassed.

18. When the bad order count was high, NS management would even pull men out of the

receiving yard and leave one man per shift. Association of American Railroads alerts received for inbound cars were also routinely ignored.

19. The carmen in the shop were instructed by NS management to only fix the defects listed on the bad order tag to expedite the cars through the repair shop. Also, the priority was to get trains out on time. When they were short of man power in the departure yard, or had additional yard repairs to work, men are pulled from the shop.

20. NS management put pressure on Mr. Fulk not to bad order cars, and NS management would routinely remove bad order tags from cars that Mr. Fulk had tagged for repair.

21. It was made very clear to Mr. Fulk by the NS management that they expected him to refrain from bad ordering so many cars. This order would have required Mr. Fulk to violate FRA regulations and NS's own rules.

22. Mr. Fulk refused and continued to put bad order tags on cars that were defective and/or non-compliant with FRA regulations. Because of his adherence to the FRA regulations, Mr. Fulk was subjected to abusive intimidation, disciplinary threats, and job threats by NS management.

23. Because of previous altercations with management, Mr. Fulk brought a voice activated recorder to work. He recorded supervisors telling him that they had removed bad order tags from cars that he shopped in order to allow trains to depart.

24. Mr. Fulk reported these acts and omissions to NS management. However, no action was ever taken to stop such treatment.

25. On 1/6/11, NS accused Mr. Fulk of trying to "sabotage" the braking system on an NS train. NS set a formal hearing to be held on 1/19/11 on the charges of "improper performance of duty" and "conduct unbecoming and employee."

26. These charges were completely false. Mr. Fulk engaged in no such conduct. Rather, these charges, an adverse action, were an attempt to terminate Mr. Fulk because he would not help NS violate FRA regulations as set-forth above. NS's actions were also intended to intimidate other employees and prevent them from bad ordering cars.

27. Mr. Fulk drafted letters to the FRA and the Regional Director of the Department of Labor's Occupational Safety & Health Administration ("OSHA") to expose NS and its supervisors for their illegal conduct and make a complaint of retaliation. These letters outlined five items that constituted violations of FRA minimum standards: (1) NS supervisors removed bad order tags from cars without the repairs being made; (2) NS supervisors suppressed inspectors from shopping cars when the bad order count was high; (3) NS eliminated the inbound inspection of cars at Linwood when the bad order count was high; (4) NS reduced the number of car inspectors as a method to reduce bad order cars; and (5) NS management harassed and intimidated employees for performing proper air brake tests and inspections that delayed trains because of bad order cars having to be set out of the train.

28. Mr. Fulk fully intended to send these letters. However, the upcoming termination hearing combined with the fact that NS was also harassing Wesley Ball (another car inspector at Linwood Yard who was also the nephew of Mrs. Fulk) combined with the years of harassment and pressure, caused Mr. Fulk to suffer a mental and psychological injury, emotional collapse, and breakdown.

29. Because of his mental injury, instability, and incapacity, Mr. Fulk did not mail the letters. Instead, he reported to work on 1/13/11 as scheduled. After he signed in for work, he went to the employee parking lot and shot himself in the head with a pistol. He died from his wounds.

30. A few days after the death, Mrs. Fulk filed a retaliation complaint with the OSHA Regional Director pursuant to 49 U.S.C. § 20109 and the regulations set forth at 29 C.F.R. Part 1982. Her complaint attached Mr. Fulk's draft letter. Said complaint was filed on behalf of Mr. Fulk and/or his Estate in Mrs. Fulk's capacity as "any person on the employee's behalf" as authorized under 29 C.F.R. §§ 1982.101 and 1982.103(a).

31. At the same time, Mrs. Fulk filed a complaint with the FRA with Mr. Fulk's draft letter attached.

32. The FRA immediately conducted an investigation at NS's Linwood Yard. This investigation showed a high defect ratio and serious defects not being found by car inspectors. Approximately 1430 cars were inspected with 333 defects noted. These defects were found after the car inspectors completed their pre-departure inspections and class one air brake tests, which means that they should have been caught. Some of the defects included missing safety appliances, broken safety appliances, freight car truck defects, brake related defects, and more than fifteen cracked couplers. Some of the cracked couplers were cracked on the knuckle side of the head and visible from along the side of the cars. In addition, two separate inspections were made of cars being released from the Linwood Car Shop. These inspections noted twenty-five defects from forty-three cars inspected, or a 58% defect ratio. Most notably were two cars with the air brakes cut out and two cars with inoperative hand brakes.

33. More than fifty employees were interviewed by the FRA. The interviewees overwhelmingly provided the names of Mr. Fulk and Mr. Ball as targets of the NS Mechanical Superintendent and General Foreman. During the interviews, no person was willing to sign a witness statement for fear of retaliation by NS management. No one was able to provide the number of cars that had the bad order tags removed. Most would not identify the NS supervisors

who were removing bad order tags.

34. The FRA interviewed the supervisors who were recorded by Mr. Fulk. One of them initially told the FRA that he did not remove bad order tags from cars but changed his statement after being confronted with Mr. Fulk's recordings, where he stated he had removed the tag. NS supervisors also admitted that when the bad order tag count was high that they told inspectors not to tag any more cars.

35. The FRA ultimately concluded on 3/8/11 that Mr. and Mrs. Fulk's allegations were true. After a full review, its inspectors found that NS did not comply with minimum standards set by the FRA regulations. Numerous violations were submitted for collection of civil penalties.

36. The FRA also determined that all employees interviewed reported incidents of "shooting" the air brakes while opening an angle cock as described in NS's charge letter to Mr. Fulk but that no person other than Mr. Fulk had ever been charged for such an act. In other words, the FRA found that in trying to terminate Mr. Fulk that NS treated him differently than it treated other similarly situated employees.

37. However, because the FRA does not have regulations regarding harassment and intimidation, it forwarded a complete copy of its findings to the OSHA Regional Director.

38. NS admitted to OSHA that no employee had ever been charged with "shooting" the air brakes while trying to conduct an air brake test.

39. As of the date of the filing of this complaint, the OSHA Regional Director has not issued a decision on the retaliation complaint filed for Mr. Fulk. None of the delay is attributable to Plaintiffs.

## Causes of Action

### Count One: FELA Survival and Wrongful Death Claims

40. Plaintiffs adopt all factual allegations stated above as if they were fully stated herein.

41. This count seeks survival damages for Mr. Fulk's injury pursuant to 45 U.S.C. § 59. This count also seeks wrongful death damages pursuant to 45 U.S.C. § 51.

42. This count is brought by Mrs. Fulk in her capacity as the personal representative of the Estate of John H. Fulk III for the benefit of herself (as surviving widow), Benjamin John Fulk (as surviving son), and Wendy Jaclyn Fulk (as surviving daughter). Mrs. Fulk, Benjamin John Fulk, and Wendy Jaclyn Fulk are hereinafter collectively referred to as the "beneficiaries."

43. NS and its management, officers, supervisors, managers, and other employees in authority negligently and/or intentionally engaged in harassing and intimidating conduct as set-forth above. This aforesaid conduct was intended to further NS's business and profit interests.

44. Mr. Fulk's workplace was rendered unsafe and unfit because of such conduct, and it was foreseeable to NS and its management, officers, supervisors, managers, and other employees in authority that such conduct could and would cause mental injury, illness, despair, and suicide.

45. NS and its management, officers, supervisors, managers, and other employees in authority knew or should have known that such conduct was occurring and negligently and/or intentionally failed to stop it. They also negligently and/or intentionally failed to properly supervise the wrongdoers, failed to discipline and/or dismiss the wrongdoers, failed to train the wrongdoers, and/or failed to make the workplace safe.

46. Mr. Fulk's mental injury and suicide were caused, in whole or in part, by the negligence and/or intentional conduct of NS and its management, officers, supervisors, managers, and other employees in authority as set-forth above. Such negligent and/or intentional conduct caused Mr. Fulk, Plaintiffs, and the beneficiaries to lose wages and benefits from Mr. Fulk's employment, caused the Plaintiffs and the beneficiaries to lose the love and consortium of

their husband and father, and for Mr. Fulk, Plaintiffs, and the beneficiaries to suffer great physical pain and suffering, mental anguish, and emotional distress.

47. Mr. Fulk, Plaintiffs, and the beneficiaries were caused to sustain and suffer all of the aforesaid injuries and damages as a result, in whole or in part, of the negligence and/or intentional conduct of NS and its management, officers, supervisors, managers, and other employees in authority while acting in the line and scope of employment.

48. Mr. Fulk, Plaintiffs, and the beneficiaries were caused to sustain and suffer all of the aforesaid injuries and damages as a result, in whole or in part, of the negligent and/or intentional failure of NS and its management, officers, supervisors, managers, and other employees in authority to provide Plaintiff with a reasonably safe place to work.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against NS, award them compensatory damages in an amount determined by the jury, award them court costs, and grant them any and all relief that is just and proper.

## Count Two – FRSA Retaliation

49. Plaintiffs adopt all factual allegations stated above as if stated herein.

50. This count seeks damages for retaliation pursuant to the Federal Rail Safety Act, 49 U.S.C. § 20109(d)(3), 29 C.F.R. § 1982.114(a).

51. Mrs. Fulk is authorized to bring this count on behalf of Mr. Fulk in her capacities as personal representative and surviving spouse pursuant to 29 C.F.R. §§ 1982.101 and 1982.103, which allows retaliation actions to be brought "by any person on the employee's behalf." In addition and in the alternative, the Estate of John H. Fulk III is authorized to bring this count as the successor of Mr. Fulk pursuant to these regulations and other law.

52. NS and its management, officers, supervisors, managers, and other employees in authority told Mr. Fulk and other rail car inspectors and carmen to stop tagging cars that were defective and/or noncompliant under the FRA regulations. Mr. Fulk refused to assist in NS in violating these FRA regulations, which were related to railroad safety.

53. In addition, Mr. Fulk in good faith refused to authorize the use of these defective cars. The defective cars presented an imminent danger of death or serious injury to employees and others who came in contact with the defective cars.

54. Moreover, Mr. Fulk was about to provide information and/or make a complaint to the FRA and the OSHA Regional Director about NS conduct that he believed constituted a violation of the FRA regulations.

55. All of Mr. Fulk's actions as set-forth above constituted protected activity under 49 U.S.C. § 20109 and 29 C.F.R. § 1982.102(b). All of Mr. Fulk's actions as set-forth above were done in good faith, were perceived by NS to have been done in good faith, and/or were perceived by NS to be about to be done in good faith.

56. NS and its management, officers, supervisors, managers, and other employees in authority knew or suspected that Mr. Fulk was engaged in and/or about to be engaged in protected activity. NS and its management, officers, supervisors, managers, and other employees in authority intimidated, threatened, reprimanded, and disciplined Mr. Fulk in whole or in part to retaliate against Mr. Fulk because he engaged in the protected activity. In addition, NS was also about to discharge, demote, suspend, and/or reprimand Mr. Fulk in whole or in part to retaliate against Mr. Fulk because he engaged in the protected activity. Mr. Fulk's protected activity was a contributing factor of NS's adverse discriminatory actions.

57. NS's adverse discriminatory actions caused: (1) Mr. Fulk to suffer mental anguish and

injury, despair, mental collapse, and to commit suicide; (2) Mr. Fulk, Plaintiffs, and the beneficiaries to lose wages and benefits from Mr. Fulk's employment; (3) Plaintiffs and the beneficiaries to lose the love and consortium of their husband and father; and (4) Mr. Fulk, Plaintiffs, and the beneficiaries to suffer great physical pain and suffering, mental anguish, emotional distress, worry, fear, and humiliation because of the wrongful conduct. Mr. Fulk's Estate, his personal representative, and/or his beneficiaries are entitled to recover these damages in his stead.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully request that this Honorable Court enter judgment in their favor and against NS, award them compensatory damages for any and all damages sustained as a result of the wrongful conduct, award them punitive damages in an amount not to exceed $250,000.00, award them litigation costs, expert witness fees, and reasonable attorney fees in the prosecution of this action, and grant them any and all relief necessary to make Mr. Fulk, the Estate, and the beneficiaries whole.

*****Plaintiff Request a Trial by Jury*****

This the 25th day of March, 2013.

Respectfully submitted,

/s/ Rachel S. Decker
Rachel S. Decker (N.C. Bar No. 22020)
Attorney for Plaintiffs

*OF COUNSEL:*
CARRUTHERS & ROTH P.A.
P.O. Box 540
Greensboro, North Carolina 27402
Phone: (336)379-8651
Fax: (336)478-1175
Email: rsd@crlaw.com